UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                          )
UNITED STATES OF AMERICA   )
                                          )
vs.                                        )         Criminal Action
                                          )         No. 05-40005-FDS
NICHOLAS RHEAULT, et al.      )
                    Defendant.          )
_____)

SENTENCING MEMORANDUM

I.      BACKGROUND

        Defendant, Nicholas Rheault, has plead guilty to all counts named in the Superseding

Indictment: Conspiracy to distribute Ecstasy, in violation of 21 U.S.C. § 846 (Count One);

Distribution of Ecstasy and Possession of Ecstasy with intent to distribute, in violation of 21

U.S.C.  § 841 (Counts Two through Four), and Felon in possession of a firearm, in violation of

18 U.S.C. § 922(g) (Count Five).  Mr. Rheault's sentence should be reasonable.  This is a rare

case in which society's interest in assuring Mr. Rheault leaves prison a better person than he was

coming in requires a sentence much lower than the guidelines suggest.  To be sure, Mr. Rheault

disputes the guideline range suggested by probation.  Nevertheless, assuming their accuracy,

they are wholly inappropriate given Mr. Rheault's circumstances. Mr. Rheault can be a

productive, law-abiding member of society.  He requires, however, that this court understand the

impetus for his conduct, realize that a shorter sentence is more beneficial than a longer one, and

exercise sound judgment.

        This court has the power to help Mr. Rheault turn his life around.  Unlike prior courts,

therapists, or even his family, this court is uniquely aware of all Mr. Rheault's motivations in

committing these acts.  With this information, this court is poised to deal with Mr. Rheault appropriately.  This court can fashion a sentence which is just and reasonable, complies with the statutory purposes of sentencing, and which assures that Mr. Rheault will not recidivate.  These goals are certainly important to Mr. Rheault and are equally, if not more important to society. However, in order to accomplish these goals, this court must take into account Mr. Rheault's tumultuous past and serious but untreated mental health problems.  This court should sentence Mr. Rheault to a period of incarceration, but not an excessive term.

Given his past, his age, his support network, and a number of factors specified below, Mr. Rheault merits a sentence of 5-7 years, with a lengthy term of probation.

## II.    LEGAL FRAMEWORK

In United States v. Booker, 534 U.S. 220, 125 S.Ct. 738 (2005), the Supreme Court invalidated the mandatory nature of the Federal Sentencing Guidelines ("Guidelines"). Specifically, the Court found the provisions of the Federal Sentencing Reform Act of 1984 which make the guidelines mandatory, 18 U.S.C. § 3742(e), incompatible with the Sixth Amendment. Booker, 135 S.Ct. at 756. Accordingly, the Court severed and excised those provisions, "mak[ing] the Guidelines effectively advisory." Id. at 757.

Instead of being bound by the Sentencing Guidelines, Booker instructs "a sentencing court to consider Guideline Ranges, see 18 U.S.C.A. § 3553(a)(4)(Supp. 2004), but it permits the court to tailor the sentence in light of other statutory concerns as well, see § 3553(a)(Supp. 2004)." Id. Sentencing courts must now treat the guidelines as "an important consideration in sentencing." U.S. v. Jimenz-Beltre, 440 F.3d 514, 518 (1st Cir. 2006).  Courts must be wary, though, since "the guidelines are still generalizations that can point to outcomes that may appear

unreasonable to sentencing judges in particular cases." Ibid. Indeed, "some of the guidelines in particular cases were not reflections of existing practice but were deliberate deviations or turned tendencies into absolutes." Ibid.

The guidelines, therefore, "enjoy no presumption of reasonableness." Id. at 521 (Torruella, J., concurring).

> To treat the Guidelines as presumptive is to concede the converse, i.e., that any sentence imposed outside the Guideline range would be presumptively unreasonable in the absence of clearly identified reasons. If presumptive, the Guidelines would continue to overshadow the other factors listed in section 3553(a), causing an imbalance in the application of the statute to a particular defendant by making the Guidelines, in effect, still mandatory.

United States v. Myers, 353 F.Supp.2d. 1026, 1028 (D. Iowa 2005); see also Jimenz-Beltre, at 526 (Lipez, J., dissenting) ("there is nothing in the language of § 3553(a) that justifies attributing to the guidelines 'substantial weight' in the sentencing decision).

Sentencing courts should begin be calculating the guideline range but must then decide "whether to exercise its new-found discretion to impose a non-guideline sentence . . . [by] determin[ing] whether other factors identified by either side warrant an ultimate sentence above or below the guideline range." Jimenz-Beltre, at 518-19. Section 3553(a) directs courts to consider, inter alia,

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range established [by the Guidelines];
> (5) any pertinent policy statement issued by the Sentencing Commission pursuant to 28 U.S.C. 994 (a)(2) . . . that [] is in effect on the date the defendant is sentenced;
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

Furthermore, § 3553(a)(2) require courts to "impose a sentence sufficient, but not greater than necessary, to comply with the [following] purposes":

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

## III.    SENTENCING FACTORS AS APPLIED TO MR. RHEAULT

### A.    Guideline Range

The court should begin by determining Mr. Rheault's guideline range. For his convictions on counts 1-4, Mr. Rheault does not dispute that his base offense level is 22. Mr. Rheault objects to any enhancement for possessing a firearm pursuant to U.S.S.G. § 2D1.1(b)(1). To apply this enhancement, the government must prove not only possession, but that possession occurred during the infraction. That is, that the government must prove "that the weapon was present." U.S.S.G. § 2D1.1 app. n. 3. In this case, the gun was found only when he was arrested. He has not admitted, nor has any evidence been adduced, which would prove even by a preponderance of the evidence that the weapon was present during the drug transactions. Mr. Rheault's co-defendant, Donald Whitney, told the authorities that Mr. Rheault carried a gun. That statement is self-serving, ambiguous, and uncorroborated. It was also not part of any sworn testimony. Moreover, even if believed, the statement does not indicate that Mr. Rheault possessed the gun during the transactions. There is no credible evidence to support this enhancement.

After subtracting three points for his acceptance of responsibility, the base level for this

offense is 19.

For his conviction on count 5, according to his plea agreement, Mr. Rheault should receive a base offense level of 14. Without regards to the plea agreement, at most, Mr. Rheault should receive a base offense level of 24. There is no evidence submitted as to whether the firearm at issue is one described in 26 U.S.C. § 5845(a) or 18 U.S.C. § 921(a)(30). Indeed, the firearm at issue was a pistol which is explicitly excluded from the definition of a firearm under 26 U.S.C. § 5845(e). Nevertheless, for purposes of argument, Mr. Rheault will also analyze his sentence with respect to probation's suggestion that his base offense level is 26.

Mr. Rheault objects to any enhancement for possessing a firearm in conjunction with another felony offense pursuant to U.S.S.G. § 2K2.1(b)(5). In order to apply the enhancement, the court must find the gun was used in "connection" with, not merely in "conjunction." The same lack of evidence to support the U.S.S.G. § 2D1.1(b)(1) enhancement plagues this enhancement. Additionally, this enhancement is subjected to more stringent proof. Under U.S.S.G. § 2D1.1(b)(1), if the government can show possession and presence, a presumption arises that the possession was connected. See, e.g., U.S. v. Hardin, 248 F.3d 489, 497 (6th Cir. 2001), quoting Hill v. U.S., 79 F.3d. 1477 (6th Cir. 1996). Under U.S.S.G. § 2K1.1(b)(5), no presumption exists: it "requires the government to come forward with additional proof." Id. There is no credible evidence of any connection. Again, the government can only rely on Whitney's self-serving, ambiguous, and uncorroborated statement.

After subtracting three points for his acceptance of responsibility, the base level for this offense is either 11, 21, or 23 (depending on the base offense level as discussed above).

Taking into account the rules for grouping offenses, U.S.S.G. §§ 3D1.1-3D1.5, Mr.

Rheault's total base offense level is either 20 (as determined by the plea agreement), 23 (without proof of whether the weapon was one described in 26 U.S.C. § 5845(a) or 18 U.S.C. § 921(a)(30)), or 25 (according to probation's recommendations).

Mr. Rheault should not be classified a Career Offender. Mr. Rheault's position is that proof of his prior convictions must be proven to a jury beyond a reasonable doubt. See generally Apprendi v. New Jersey, 530 U.S. 466 (2000); Booker; and Shepard v. U.S., 544 U.S. 13 (2005). Mr. Rheault understands that the First Circuit has already stated that it is bound to follow U.S. v. Almendarez-Torres, 523 U.S. 224 (1998) (sentencing judge may make findings of a defendant's prior record). See U.S. v. Ivery, 427 F.3d 69 (1st Cir. 2005). Mr. Rheault presents this argument to preserve his appellate rights.

Mr. Rheault's criminal history category should be level 9. Mr. Rheault does not dispute probation's calculations except with respect to his juvenile sentences. Probation counted Mr. Rheault's two juvenile sentences separately, giving him 2 points for each. This was improper. To begin with, "prior sentences are considered related if they resulted from offenses that . . . (C) were consolidated for trial or sentencing." U.S.S.G. § 4A1.1 application note 3. However, the sentences cannot have been separated by an intervening arrest. Id. In this case, Mr. Rheault's cases were indeed consolidated for sentencing. Moreover, there is no information that he was arrested at all for either juvenile offense, as opposed to having been summonsed into court. See U.S. v. Patrick, 41 F.Supp. 2d 73, 84-85 (D.Mass. 1999) (lack of record indicating defendant was arrested resolved in favor of defendant). Unlike Patrick, there is a record which indicated his status: his docket indicates that he was summonsed. These sentences should not have been counted twice.

6

Additionally, Mr. Rheault should only have received one point total for these charges. The guidelines treat sentences for crimes committed before 18 differently than other offenses. These crimes are dealt with in U.S.S.G. § 4A1.2(d) titled, "Offenses Committed Prior to Age Eighteen." See U.S.S.G. § 4A1.1 and application note 2; U.S. v. DiPina, 178 F.3d 68, 71 (1st Cir. 1999). Unlike other offenses, which are counted dependent on the conduct at issue, see U.S.S.G. § 4A1.2(a), this section specifically states that the sentence is what determines the criminal history points. Relevant to Mr. Rheault, he is to receive one point for each adult or juvenile sentence of less than sixty days confinement. U.S.S.G. §§ 4A1.2(d)(2)(A) & (B). Mr. Rheault received only one sentence for these two crimes. He was arraigned and sentenced on the same date. His sentence, moreover, was straight probation (with an unspecified sentence suspended). These sentences should not have been counted twice and he should only have been given one point total for all his juvenile offenses.

After he violated his probation, he was committed to Department of Youth Services ("DYS") custody. That alone, however, does not reflect that he received a sentence of incarceration. Once committed to DYS, a defendant must go through a classification process at which point DYS determines whether a juvenile should be confined to a secure institution or receive some other sanction, which can range from foster care, residential programs, or simply provide support services while he remains at home. See generally Krupp, Debra, Juvenile Delinquency Law Primer, (1998). Mr. Rheault's records does not reflect where he went while committed to DYS. He was certainly not committed to a secure facility the entire time, as even the PSR acknowledges that he participated in several programs and even lived at home. To the extent Mr. Rheault's records do not reflect his sentence, this court cannot go beyond the

charging documents and court documents.  <u>Shepard v. U.S.</u>, 544 U.S. 13 (2005).  This court cannot presume he received a sentence of incarceration more than 60 days and he must therefore only be given 1 point.

With a criminal history of 9, and a base offense level of 20, his guideline range is 51-63.  With a criminal history of 9, and a base offense level of 23, his guideline range is 70-87.  With a criminal history of 9, and a base offense level of 25, his guideline range is 84-105.  Because the guidelines are not mandatory, they only present a starting point in determining a reasonable sentence.  Mr. Rheault argues that his guideline range should be 51-63 months, but understands that other calculations are possible.  Therefore, Mr. Rheault would suggest his guideline range should be an average of the three possible sentences listed above: 70-87 months (roughly 5-7 years).[1]  Having established the guideline range, this court has an obligation to consider factors

---

[1] Mr. Rheault acknowledges that the PSR suggests a guideline range of 151-188 months.  This is based primarily on his classification as a Career Offender.  Mr. Rheault disputes this classification.  To the extent the court relies on this, the rest of Mr. Rheault's sentencing memo should be read as arguing for a lower sentence.  To the extent that the court does not find Mr. Rheault to be a career offender, the rest of the sentencing memo should be read as affirming why his guideline calculation (70-87 months) is a reasonable sentence and the court should not depart upwards.

The draft PSR also suggested Mr. Rheault may be an Armed Career Criminal.  Mr. Rheault does not qualify for this enhancement in any way.  An armed career criminal is one who has three prior violent felonies or serious drug convictions as defined by 18 U.S.C. 924(e).  <u>See</u> U.S.S.G. §§ 4B1.4.  A serious drug conviction is one for which the "maximum term of imprisonment [is] ten years or more."  18 U.S.C. § 924(e)(2)(A)(ii).  None of Mr. Rheault's drug convictions carry such a penalty.  His convictions in Massachusetts were for possession and possession with intent to distribute a class D substance, to wit, marijuana.  The maximum penalty for those offenses is two and one-half years.  <u>See</u> M.G.L. ch. 94A § 32C.  Mr. Rheault's New Hampshire conviction was for possession of less than one ounce of marijuana and straight possession.  The maximum penalty for those offenses is three years.  <u>See</u> N.H. Rev. Stat. Ann. 318-B:26(I)(d).  None of his drug convictions therefore qualify as serious drug offenses as defined by 18 U.S.C. § 924(e).

Mr. Rheault's conviction for breaking and entering in 2002 is not a violent felony because it was of a motor vehicle.  <u>See</u> <u>Shepard v. U.S.</u>, 544 U.S. 13, 15-16 (2005), <u>citing</u> <u>Taylor</u>

beyond the guidelines as listed in 18 U.S.C. § 3553(a).

      B.    <u>Section 3553(a)(1) (the nature and circumstances of the offense and the history and characteristics of the defendant)</u>

Mr. Rheault's offenses were serious.  Mr. Rheault will not minimize the extent of his crimes.  He and Donald Whitney were distributing ecstasy.  Nevertheless, there is no evidence that their distribution was far reaching: all of their known sales were to undercover officers.  There is also no evidence that they were dealing in such large amounts until DEA agents became involved.  Were it not for the agents continuing to set up controlled buys, the amount in question would have been significantly lower.

Additionally, it cannot be emphasized enough that Mr. Rheault never acted violently or aggressively in committing these actions.  Even when he had the opportunity and incentive to be aggressive–when he was being arrested–he did nothing.  He hid, and when discovered, did not put up a fight.  Ironically, the person who seems must hurt by Mr. Rheault's actions is himself.

Mr. Rheault is a troubled young man.  Mr. Rheault's problems can be traced to his extraordinarily early drug use.  Mr. Rheault tried marijuana and alcohol at the age of 12 or 13.  From that point, up until his arrest in his matter, Mr. Rheault has spent his life on drugs.  Over the years, Mr. Rheault has progressed to more dangerous substances.  He went from merely using marijuana to using cocaine (at age 15), ecstasy (at age 16), heroin (at age 21), OxyCotin (at age 20), in addition to crystal meth, LSD, and mushrooms.

---

<u>v. U.S.</u>, 495 U.S. 575 (1990) (affirming that a violent felony is generic burglary, not burglary of a boat or car).  Mr. Rheault's conviction for possession of a firearm without a FID card is likewise not a violent felony because it lacks "as an element the use, attempted use, or threatened use of physical force against the person of another."  18 U.S.C. § 924(e)(2)(B)(I).  That leaves only one conviction for breaking and entering in 1999 which arguably counts as a violent felony.  One conviction, however, is not enough to qualify as an armed career criminal.

Like some drug addicts, Mr. Rheault was trying to escape himself: he was self-medicating. Early on, he had stated that he did not feel right inside and that drugs kept him numb in his head. See PSR ¶ 110.[2] Unlike most persons who are drug dependent, though, Mr. Rheault is highly self-aware. He has often acknowledged that he takes drugs to cover up his mental problems. He told probation that he was "messed up" because "a normal person would not be [selling and using drugs]." Id. at ¶ 119. Mr. Rheault's acknowledgment that he has serious mental health problems is quite remarkable in that it demonstrates just how grave his conditions are. His mental health problems are so pervasive that they were apparent to even him. And they are so compelling that the only thing he could do to cover them up was continue to use drugs as an escape. Just before his arrest, he stated he was doing up to 10 to 20 bags of heroin per day.

Mr. Rheault's perception of his own mental instability is quite accurate. Dr. Jerome Rogoff evaluated Mr. Rheault. In his professional opinion, Mr. Rheault suffers from Bipolar Disorder and has suffered from such for most of his 22 years. See generally, CV and Report of Dr. Rogoff, Exhibit 1. Dr. Rogoff confirms that Mr. Rheault's "basic motivation was in fact not a criminal one, but one of attempted self-treatment for an undiagnosed condition that he did not understand and over which he had no control, and which was quite unsettling and disruptive of normal development and normal behavior." Id. His self-medication eventually turned into addiction:

> Clearly, [Mr. Rheault] was bewildered by his uncontrollable mood swings, and
> took refuge in the only thing that was available to him that gave him some relief,

_____

[2] Citations to the PSR are based on probation's first draft. After it has been edited, the paragraph numbers may have changed.

10

however temporary, from his disease.  In fact, precisely because the relief was so
temporary, he was led to repeat it over and over again, becoming addicted.  Once
addicted, he became desperate and was compelled to serve the addiction by any
means available[.]

Id.

Mr. Rheault's brushes with the law are indicative of drug dependency.  He has

convictions mainly for drug possession, distribution, and breaking and entering.  None of his

crimes, however, involved any violence.  He has no history of assault, intimidation, or anything

remotely violent.  He has possessed weapons, but no history of ever using them.  When he was

arrested, he could easily have made the situation worse by using his weapon.  He did not,

though.  Mr. Rheault is simply not a violent individual.  Despite his dependency and despite his

mental health problems, he is genuinely passive.  His criminal history demonstrates that he

committed crimes because of his drug problem and not because he is inherently a bad person.

Again, Dr. Rogoff confirms this reasoning.  After becoming addicted to drugs, Mr.

Rheault "used the drugs to sustain a habit that was out of control.  Moreover, as with many

addicts, his illegal activity in selling drugs was in the service of getting the money to maintain

his habit."  He emphasizes, though, that Mr. Rheault's "internal sense of decency was never

compromised enough to allow him to engage in violent crime.  His fights were more the result of

his abnormal mental states from hi Bipolar Disorder than from his drugs."

Mr. Rheault comes from a regular, middle-class family.  His Dad is the County Interstate

Manager for the Department of Corrections in Massachusetts.  His mom works for a chemical

company.  He has two older sisters.  Growing up, Mr. Rheault received mixed signals from his

parents.  His Dad was the strict one and his Mom was more lenient.  His family struggled with

his actions as much as he did.  They generally did not know how to deal with Mr. Rheault.  The

11

extent of his mental health problems were never clear to them either.  And like many families in their position, they relied on the State to help Mr. Rheault when there was no where for them to turn.

Mr. Rheault was committed to DYS custody.  He spent many years in and out of their various programs, but nothing seemed to help.  Mr. Rheault's drug dependency and use escalated, as did his criminal conduct.  For whatever reason, DYS could not assist Mr. Rheault.  The State ended up failing him.  Instead of finding help from multiple sources, he found help from no where.

As Mr. Rheault grew older, he was no longer subject to DYS custody.  Unfortunately, his driving addiction pushed him to more problematic conduct.  He found himself before a court more often.  The courts, in turn, continued to fail Mr. Rheault.  They never recognized his problems.  Mr. Rheault received several probationary sentences, none of which managed to hone in on his problems; none of his sentences dealt squarely with his dependency.  Being on probation and getting drug tested was not going to cure his addiction, it was only going to catch it.  Except by this point, there was no question that he had a serious drug problem layered over serious mental health problems.  He was being set up to fail time and time again.

All of this led to Mr. Rheault's current offenses.  When he committed these offenses, Mr. Rheault was spiraling out of control with his drug use, getting through life without treatment or having to confront his problems, and needed a way to maintain his addiction.  By his own admission, he was using 10 to 20 bags of heroin a day.  His current actions were almost inevitable, given Mr. Rheault's lack of treatment and repeated failure by the authorities to recognize the source of his problems.  His actions were the actions of a hopeless individual,

abandoned by those around him, with no escape other than to act in a self-defeating manner.

Mr. Rheault's current offenses are certainly serious. He reached a level of distribution which far exceeded his previous amounts.[3] For this, Mr. Rheault takes full responsibility. He violated the law, he understands that, and he is remorseful. Taking responsibility in this case is especially impressive given that the evidence against him was not overwhelming. Surveillance merely demonstrated that Donald Whitney had a source living in Mr. Rheault's apartment where several other persons resided. The audio and videotapes themselves are of poor quality. Nevertheless, Mr. Rheault wanted to plead guilty. He finally realizes the magnitude of his actions. He has come to understand that he had lost control of his life, of his mental health, and of his addiction. He wants to take responsibility for that regardless of the consequences.

In taking responsibility, Mr. Rheault is demonstrating that he has a good heart and simply progressed through life overwhelmed by his untreated problems. Nevertheless, despite his problems, he managed to endear a core group of close friends and family, who do not recognize the person who committed these offenses. One of his closest friends, Joseph Dufour, notes that he could always rely on Mr. Rheault: "He has helped me out financially when I wasn't able to help myself. Nick has always been the one to keep me out of trouble growing up, and telling me to think through my actions before regretting them." See, Letters from Friends, Exhibit 2. Ms. Linda Allard notes that she has "always felt able to depend on any member of the [Rheault] family, including Nicholas, who has always been a very giving person, to answer any need I or

---

[3] Previously, he had convictions for small amounts of drugs: one marijuana cigarette (Juvenile offense); seven small bags of marijuana (Leominster offense); less than one ounce of marijuana (New Hampshire offense); and possession of a few ecstasy tablets (New Hampshire offense).

my family may have or had." Id. Mr. and Mrs. Wintringham write that they "remember Nicholas to have been a decent young man who had many friends, loved snowboarding and going to Red Sox games." Id. Angela Marrama, the mother of one of Mr. Rheault's friends, never had any trouble with Mr. Rheault. "If I said do not eat in the bedroom he never did. Always took his shoes off when he came in my home and was just a real nice kid. As Nick got older that never changed. For the last four years that my mother has been living with me, Nick would always make a point to talk to her and me when he came over. He always took the time to say hello and how are things going and we would have talks about many things." Id.

His sister, Ashleigh, adds, "I know he's my brother and I love him but what most people don't know about him is that he really is a good person. He has a good heart and really tries to do what's right. I believe that his judgment has been impaired due to the amount of drugs he used over the course of time. When my brother is straight, he is a totally different person." See Letters from Family, Exhibit 3.

C.     Section 3553(a)(2) (The need for the sentence imposed) and the types of sentences available)

In addition to the individual characteristics, this court must take into account the purposes of sentencing:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2). Mr. Rheault is in the rare situation where each purpose of sentencing applies to him and each purpose dictates a lenient sentence.

1.    *To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.*

Mr. Rheault acknowledges that his offense was serious.  But, as noted, his offense did not involve violence and all his sales were to undercover officers.  A just punishment, without reference to the person who committed the crime, would certainly warrant a sentence much less than probation's recommendation.

A sentence of 5-7 years would promote respect for the law.  Mr. Rheault has never received a sentence of more than six months for any of his past convictions.  He has generally been sentenced to a term of probation, often with an underlying suspended sentence.  The time he has been held awaiting disposition of his case far exceeds anything he has previously known.  Essentially, he is becoming fully aware of the consequences of his actions.  A sentence of 5-7 years would still be 10 to 12 times more than any previous incarceration he has served.  That is more than sufficient.  In contrast, a sentence of 155 months would be almost 23 times more than any previous incarceration.  That sentence would not promote respect for the law; it would promote contempt for it.

Mr. Rheault has accepted responsibility for his actions and accepts that he must serve a jail sentence.  But he expects to serve a fair sentence.  Probation's recommendation would far exceed a fair sentence.  It would create animosity and regret, thereby nullifying Mr. Rheault's contriteness.

2.    *To afford adequate deterrence to criminal conduct*

A sentence should be fashioned which will deter individuals generally, and the defendant specifically, from committing new criminal acts.  It is very difficult to determine at what point a sentence is sufficient to accomplish these goals.  A sentence of 155 months in this case would

not likely act as a deterrent to others similarly situated to Mr. Rheault. That is, it would not deter

any individual inclined to commit the same criminal act but who possesses the same inability to

refrain from certain conduct.  Mr. Rheault was motivated and driven by forces generally beyond

his control.  He was in a state of mind that did not allow him to fully recognize his problematic

conduct.  Unfortunately, it is nearly impossible to reach persons who have untreated mental

health problems and who cover up those problems with drugs.  The only real way is for them to

get a wake up call, and the chance to fix themselves, as Mr. Rheault now has.

A reasonable period of incarceration is needed to deter Mr. Rheault from this conduct

again.  It will allow Mr. Rheault to experience Federal prison, a setting worse than anything he

has gone through before.  But it must also assure that Mr. Rheault continues to believe that

prison is worse than anything he has ever gone through before.  As soon as Mr. Rheault begins to

become comfortable with his surroundings, or comfortable with the idea of being in prison, his

sentence stops becoming a deterrent.  A sentence of 155 months simply gives Mr. Rheault too

much time to adjust to prison.  A sentence of 5-7 years assures that his experience will be bad

enough that he never wants to return.

3.    *To protect the public from further crimes of the defendant*

This sentencing goal goes hand in hand with deterring Mr. Rheault from recidivating and

assuring he gets the help he needs to come out a new person.  The public will be safe if Mr.

Rheault leaves prison with hope, with counseling, and with a strong support network.  The

longer his sentence, the more likely all of those things will disappear.  A long sentence increases

the chances he will lose touch with friends and family–all people whom are willing to be there

for Mr. Rheault during and after his incarceration.  A long sentence increases the chances that he

16

will not get the mental health and drug counseling that he needs, for if he is waiting ten years until he is released, he has little incentive to get started early. And a long sentence increases the chances that he will lose hope. He would feel as if his release is simply too far away to matter. Instead of wanting to turn his life around, he would focus on adjusting to the prison environment and culture.

A long sentence would virtually assure that Mr. Rheault would be more dangerous to society upon release and therefore not meet this sentencing goal. A shorter sentence would assure that Mr. Rheault would be productive upon release. Hope is a powerful incentive. Starting your life over at 28 years old is more encouraging than starting over at 38 years old.

4.      *To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner*

This factor is squarely on point with Mr. Rheault's case. There is no doubt that he needs to undergo counseling. Mr. Rheault also needs to learn skills to be successful in life once released. These take time; but these skills also diminish if not tested. A shorter sentence allows Mr. Rheault to commit to learning what he needs to be productive upon release, and assures that those lessons are fresh in his mind. A long sentence does not allow him to practice what he has learned and whatever progress he has made will simply fall along the wayside.

The best way to effectuate this is by shortening Mr. Rheault's sentence but assuring that his probation after the fact gives him the appropriate supervision and treatment he needs to succeed. Probation would be successful, primarily because Mr. Rheault has such a great support network. Despite his problems, his parents stand by him today as much as they ever have. They genuinely love their son, and would do what they could to help him. His mother, Deborah Rheault, writes that he is surrounded by a "family that loves and supports him and will offer

17

whatever assistance he required to get started. . . His family will be there to give him help and support[.]" See Letters from Family, Exhibit 3.  His sister, Ashleigh, concurs: "I love my brother and will be willing to give him emotional support and help when he is released.  His time in jail will help him to realize that his family was always there for him during the rough times and will be there going forward."  Id.  His other sister, Alexis, adds that "[w]ith professional help and the support of his family, I firmly believe that he has the ability to grow up and become someone of use to society."  Id.  His father will address the court at sentencing.

His very good friend, Joseph Dufour, continues to stay in touch with Mr. Rheault.  He adds, "Upon Nick's release I give my word to the courts that he is always guaranteed a job at one of my establishments, and I will more than gladly put a roof over his head if need be."  See Letters from Friends, Exhibit 2.

D.    Section 3553 (a)(3) (The types of sentence available)

According to the guidelines, incarceration is the only type of sentence available.  But the length of sentence, after Booker, must be reasonable.  Mr. Rheault is eligible for a shorter sentence than that recommended by probation.  He is also eligible for a long term of probation, something which would be more beneficial than sitting in jail.

E.    Section 3553(a)(4) (The types of sentences set forth in the Guidelines)

See Section III(A), *infra.*

F.    Section 3553(a)(5) (Any pertinent policy statement issued by the Sentencing Commission)

There are no policy statements unique to Mr. Rheault's case.

G.    Section 3553(a)(6) (Avoid disparity between defendants)

It is uncertain what Mr. Whitney's sentence will be.  But both he and Mr. Rheault acted

comparably in this endeavor.  Mr. Whitney will most likely receive a sentence far below even

Mr. Rheault's recommendation of 5-7 years.  If Mr. Rheault were sentenced to 155 months, the

disparity between the two would be immense.  Moreover, it would be unwarranted.  There is

nothing in Mr. Whitney's fact pattern which suggest he was any less culpable or responsible than

Mr. Rheault.

>    H.    Section 3553(a)(7) (The need for restitution)

This section is inapplicable to Mr. Rheault's case.

**IV.    CONCLUSION**

Mr. Rheault has not adjusted well to his incarceration.  He is young, immature, and in

need of mental health therapy.  Accordingly, he struggles day-to-day with his circumstances.  He

has incidents with guards, he is severely depressed, he cries often–much more often than ever

before.  At times he acts tough in an attempt, no doubt, to deal with his vicious surroundings.

Anyone who knows him, though, knows it is indeed just an act.  Mr. Rheault is a boy amongst

men, dangerous and experienced criminal men.  And he will continue to be that boy for the next

few years of his incarceration.

This feeling of fear, of being out of place, of wanting to get out, is exactly the kind of

feelings that we as a society hope Mr. Rheault takes with him whenever he is released from jail.

If he leaves jail feeling the way he does now, then we can all be assured that Mr. Rheault's

criminal days are long over.  However, if he spends enough time in jail, a young, immature, and

fearful Mr. Rheault will turn into someone who feels comfortable with his surroundings.  He will

become accustomed to them, and his desire for life on the outside will be overtaken by his

familiarity and comfort with life on the inside.  If Mr. Rheault leaves jail with these sentiments,

then his criminal days are far from over.

An important part of sentencing is deterrence and protecting the public.  Those goals will be accomplished by assuring Mr. Rheault spends just enough time in jail to be punished, but also to remain scared of returning.  With the hope of being able to start over upon release, Mr. Rheault will be deterred and the public will be safe from him.  Without that hope, these lofty sentencing goals will not be met.  Mr. Rheault will feel abandoned, hopeless, and defeated.

Booker has been both criticized and lauded since it was decided.  Whatever the merits of that debate, it is settled law.  This court, therefore, is freed from the guideline shackles which once imprisoned judges from handing out appropriate sentences.  The overgeneralizations the guidelines bestowed on offenders are no longer irrefutable.  Mr. Rheault's guideline range suggests a sentence far too harsh to meet the goals of sentencing.  Mr. Rheault is not the person the guidelines suggest he is and therefore does not merit a sentence which the guidelines suggest he merits.  A reasonable sentence would be the guideline range, disregarding the career offender designation.  In Mr. Rheault's case, that would be a sentence of about 5-7 years, followed by a significant term of supervised release.  It would be reasonable to give Mr. Rheault a term of supervised release perhaps as long as he would have been incarcerated as a career offender.  This would be essential in assuring Mr. Rheault has a long reminder of the consequences of his actions; but it would also allow him to begin to reconstruct his life at a point in time early enough for his release to have real meaning.

Dr. Rogoff's analysis is quite poignant: Mr. Rheault "is a young man who has committed the crimes of which he is accused, but he has a lifelong mental illness that has played a very real and profound part in impelling him into the commission of those crimes."  Mr. Rheault should be

punished.  He should not, however, be punished for being Bipolar and a drug addict.

The relationship of mental health problems and addiction is by now a common occurrence.  It is unusual, though, for it to play out so soon and so drastically as it has with Mr. Rheault.  He has suffered from Bipolar disorder for the majority of his life, and has ingested more drugs by the age of 22 than many addicts do in a lifetime.  Mr. Rheault is not asking for mercy.  Mercy is reserved for persons who have no justification or excuse for their actions.  Mr. Rheault is asking for fairness.  Fairness is reserved for persons like Mr. Rheault–persons who know they have wronged, but were compelled by forces largely beyond their control.

Respectfully Submitted,

Date:   May 24, 2006                          /s/ John Swomley
                                                               _____
                                                               John G. Swomley,
                                                               BBO# 551450
                                                               Swomley and Associates
                                                               227 Lewis Wharf
                                                               Boston, MA 02110
                                                               Tel. (617) 227-9443

### CERTIFICATE OF SERVICE

I, John G. Swomley, certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will delivered to those indicated as non-participants on May 24, 2006.

Signed under the pains and penalties of perjury, this 24th day of May, 2005:

/s/ John G. Swomley
_____

# EXHIBIT 1

JEROME ROGOFF, M. D.
659 CHESTNUT STREET
WABAN, MASSACHUSETTS 02468

Office Telephone 617-964-1805

May 11, 2006

John Swomley, Esq.
227 Lewis Wharf
Boston, MA 02110-3927

Re: Psychiatric Evaluation of Nicholas Rheault (DOB 12/5/83)

Dear Mr. Swomley:

At your request, I interviewed Mr. Nicholas Rheault at the Donald Wyatt Federal Detention Center in Central Falls, RI, on May 8, 2006, for the purpose of evaluating him psychiatrically. I spent one and one-half hours with him. I also reviewed his medical record from the Wyatt Detention Center that you had sent me. You asked me to ascertain his current psychiatric status and his past psychiatric history and to give you my professional opinion at to what bearing, if any, this mental state has had on his criminal behavior.

I am a psychiatrist, certified in Psychiatry by the American Board of Psychiatry and Neurology, a Distinguished Life Fellow of the American Psychiatric Association, and a former Councillor and Past President of the Massachusetts Psychiatric Society. I am a Representative of the Massachusetts Psychiatric Society in the Assembly of the American Psychiatric Association. I am also a psychoanalyst and a forensic psychiatrist and member of the American Academy of Psychiatry and The Law. I was Associate Clinical Professor of Psychiatry at Tufts Medical School from 1976 to 1986 and Lecturer on Psychiatry at Harvard Medical School from 1986 to 1994 and from 2001 to the present. I was Associate Chief of Psychiatry and Chief of Inpatient and Day Hospital Psychiatry at the Faulkner Hospital in Boston from 1975 to 1994. I was for four years Senior Psychiatrist at the Massachusetts Correctional Institution at Norfolk, have been a consultant to the Massachusetts Governor's Board of Pardons and Commutations, to the Parole Board, and to the Probate Court of Plymouth County, Massachusetts, as well as to the Law Enforcement Assistance Administration of the Federal government. I have served as an expert witness in most areas of forensic psychiatry, both civil and criminal. I was a founding partner of the Law and Psychiatry Resource Center, P.C., of Boston. I am now in full-time private practice of psychiatry, psychoanalysis and forensic psychiatry.

It is my professional opinion, with a reasonable degree of medical certainty, that Nicholas Reault has suffered from a Bipolar Disorder (formerly called manic-depressive illness) for much of his 22 years of life and that most of his activity in taking illegal drugs has been in the service of his attempt to self-medicate his illness in order to try to deal with unbearable or uncontrollable feelings. I say "most" because after a certain point, addiction takes over and has a life of its own, and then he used the drugs to sustain a

habit that was out of control. Moreover, as with many addicts, his illegal activity in selling drugs was in the service of getting the money to maintain his habit. The data and reasoning on which my opinion is based follow.

Nicholas Rheault was born in Leominster, MA, the youngest of three children, with two older sisters. His parents were separated when he was 12 or 13 years old, but they still live in the same house, but have separate bedrooms. One of Nicholas's sisters used drugs, the other did not. Neither is married. His mother works at a chemical company and his father is a lieutenant in the Massachusetts Department of Corrections.

Nicholas remembers having mood swings as a child, and his educational record reflects it. He attended public school in Massachusetts through the sixth grade, and then was transferred to a special school for children with behavioral problems, and then to another special school (The Caldwell) through the eighth grade. He then went to a regular public high school where he was in a special education program (The Pace Program) until the 10th grade, at which point he either dropped out or was kicked out, he does not remember which it was. He finally earned a GED while in a post-detention center after his HOC incarceration in Worcester.

He describes periods of "being down," during which he cries a lot. He also describes periods of being "out of control happy," during which times he can become quite irritable when thwarted and "on the offensive," leading to fights, all of which is quite typical of manic or hypomanic episodes in Bipolar Disorder.

He was obese as an adolescent, weighing up to 280 lbs. at age 16. He managed to reduce this to 180 lbs. when he was working one year. He says he weighed 210 lbs. when he entered the Wyatt Detention Center, and he now weighs about 240 lbs.

At age 15 or 16 he was committed to the Massachusetts Division of Youth Services for two weeks, then again for another two weeks, then for four and a half weeks, and finally for six months. All of these incarcerations were related to his drug use and the non-violent crime he engaged in, such as Breaking and Entering, to get the money for the drugs he was using. He smoked marijuana in high school, and was jailed for a few weeks in New Hampshire for distributing marijuana and possibly Ecstasy. Then he spent four and a half months in the Worcester, MA, House of Correction for possession of a gun, malicious destruction of property while drunk and possession of illegal drugs. The gun was found in a search of his apartment. He claims never to have used a gun, and has not been involved in violent crime, but he kept the gun for possible self-defense, given the drug-using and drug-dealing crowd with which he was of needs associated. He was on probation in both New Hampshire and Massachusetts when he was arrested and detained at the Wyatt Center.

He has a very spotty work history, due to his drug use and his incarcerations. He

2

worked at a restaurant for a week, and had several short-term unskilled jobs at a supermarket that was interrupted by his stints in the DYS. He once worked for six months at a Kentucky Fried Chicken restaurant, and at Filene's for a year, cleaning and unloading trucks. (It was during this year that he lost weight).

He has not had many girlfriends, due to both his shyness and his obesity. Following his time in the Worcester HOC, he did have a relationship with a woman for a year, which he describes as poor and dysfunctional. Both the woman and her mother were alcoholics, and he and she drank a lot. Both of them were quite immature, and they fought a lot, but verbally, as he never hit her. He had had a little casual sex before this relationship, and some after it. For several months before coming into the Wyatt DC, he had a girlfriend whom he says he really loved for the first time in his life, but that relationship ended with his incarceration.

His drug use has been extensive and of long history. He used cocaine regularly since age 15, and also used marijuana and alcohol since then. He occasionally used LSD and percosets. He has been prescribed clonazepam (Klonopin) and alprazolam (Xanax), which are benzodiazepines used for anxiety. He says that he has alway been "doing" something, with the sole exception of one year of abstinence 3 years ago. Three to four months before his current incarceration, he used heroin (nasally) for the first time. He also used Ecstacy.

His understanding is that he is charged with three counts of distributing Ecstacy, one count of conspiracy to distribute Ecstacy, and one count of felony possession of a firearm.

Since being in Wyatt, he did time in segregation from March 17 to May 5 for a verbal fight with a correctional officer who, he claims, tried to provoke him into a fistfight, finally shoving Nicholas's head against a wall when he would not take the bait. He was then charged with assault on a correctional officer.

In Wyatt, he is on lorazepam (Ativan, another benzodiazepine), 1mg. twice a day and 2 mg. at hour of sleep. He is also being given divalproate sodium (Depakote, a mood stabilizer used psychiatrically primarily for Bipolar Disorder), and doxepin (Sinequan, an anti-depressant). Thus, he is under treatment for Bipolar Disorder, anxiety and depression. He has had a decreased need for sleep, a hallmark of Bipolar Disorder, when coming off of drugs. He has a lifelong history of mood swings, for which he saw a psychiatrist when not incarcerated, and in the past, between the ages of 12 and 16, he was prescribed the anti-depressants Prozac and Remeron, and the anti-psychotics Seroquel and Zyprexa. It is possible that the Remeron and the Seroquel were prescribed as sleep medications or to treat his mood swings. He does not give a history of having been psychotic, but that cannot be ruled out without seeing his previous medical records.

3

Mr. Rheault was under good control when I saw him, with a stable mood on the medicine he is taking. He was very open and cooperative with me, and poignantly reflective about the course his life has taken, for which he blames no one but himself. On Mental Status Examination, he was quite normal. He was fully oriented to person, place, time and situation. He was able to repeat seven digits forward and four backward. He accurately remembered three out of three items after 15 minutes. His fund of knowledge was within normal limits, as was his ability to compare and contrast. Oddly, he could not do serial 7's (counting backward from 100 by 7's), claiming that math was a weak point, but his ability to correctly interpret abstract proverbs was exceptionally good, getting all four of the proverbs I put to him correctly. His social judgment was normal.

I certainly cannot say that Nicholas Rheault did not at any time know what he was doing, or that he did not know that it was illegal, but his basic motivation was in fact not a criminal one, but one of attempted self-treatment for an undiagnosed condition that he did not understand and over which he had no control, and which was quite unsettling and disruptive of normal development and normal behavior. Clearly, he was bewildered by his uncontrollable mood swings, and took refuge in the only thing that was available to him that gave him some relief, however temporary, from his disease. In fact, precisely because the relief was so temporary, he was led to repeat it over and over again, becoming addicted. Once addicted, he became desperate and was compelled to serve the addiction by any means available, although it is notable that his internal sense of decency was never compromised enough to allow him to engage in violent crime. His fights were more the result of his abnormal mental states from his Bipolar Disorder than from his drugs.

Nicholas Rheault presents a truly tragic picture. He is a young man who has committed the crimes of which he is accused, but he has a lifelong mental illness that has played a very real and profound part in impelling him into the commission of those crimes. As a psychiatrist, whose entire career has been primarily in the treatment of this kind of mental illness, and in trying to understand what having such an illness entails for the person who has it and for those around him, it is impossible for me to not have a great deal of compassion for Nicholas Rheault. I do hope that the Federal Criminal Justice system also has room for some compassion; for justice tempered with mercy for the mentally ill.

Sincerely yours,

Jerome Rogoff, M.D.

4

JEROME ROGOFF, M. D.
659 CHESTNUT STREET
WABAN, MASSACHUSETTS 02168
———
Office Telephone 964-1805

## CURRICULUM VITAE

Name: Jerome H. Rogoff, M.D.

Address: 659 Chestnut St., Waban, MA 02168

Date of Birth: December 21, 1938

Place of birth: Detroit, Michigan

Education:

| | |
|---|---|
| 1960 | A.B. Harvard College, Cum Laude (History and Literature) |
| 1965 | M.D. Western Reserve University Medical School |

Postdoctoral Training:

| | |
|---|---|
| 1965 | Clinical Neurology, Radcliffe Infirmary, Oxford, England (Two months) |
| 1965-1966 | Intern in Medicine, Michael Reese Hospital, Chicago, Illinois |
| 1968-1971 | Resident in Psychiatry, Massachusetts Mental Health Center, Boston |
| 1971-1972 | Fellow, Massachusetts Mental Health Center (Adams House), Boston |
| 1972-1973 | Chief Fellow, Massachusetts Mental Health Center (Adams House), Boston |
| 1977 | Graduate, Boston Psychoanalytic Institute |

Licensure and Certification:

| | |
|---|---|
| 1965 | National Board of Medical Examiners |
| 1968 | Massachusetts Medical License, Registration No. 30835 |
| 1978 | American Board of Psychiatry and Neurology, Certificate No. 18476 |

Academic Appointments:

| | |
|---|---|
| 1968 | Teaching Fellow in Psychiatry, Harvard Medical School |
| 1969-1971 | Clinical Fellow in Psychiatry, Harvard Medical School |
| 1975-1979 | Clinical Instructor in Psychiatry, Harvard Medical School |
| 1977-1986 | Associate Clinical Professor of Psychiatry, Tufts Medical School |
| 1980-1981 | Lecturer on Psychiatry, Harvard Medical School |

2

1981-1985  Adjunct Assistant Professor, Simmons College School
             of Social Work, Boston
1984-1994  Lecturer on Psychiatry Harvard Medical School

Hospital Appointments:

1972-1974  Westwood Lodge Hospital, Westwood, MA
             Staff Psychiatrist
1975-1994  Faulkner Hospital, Boston
             Associate Chief of Psychiatry
             Director of Inpatient Psychiatry
             Director of Day Hospital
             Ambulatory and Emergency Care Committee
1983-1994    Pharmacy and Therapeutics Committee
1975-1984  The Arbour (formerly Glenside Hospital)
             Admitting Psychiatrist

Other Professional Positions:

1966-1968  Peace Corps Physician, Kathmandu, Nepal (USPHS)
1971-1973  Senior Psychiatrist, Massachusetts Correctional Institution, Norfolk, MA
1971-1978  Consultant Psychiatrist, Massachusetts Governor's Executive Council,
             Massachusetts Parole Board, Governor's Board of Pardons and
             Commutations
1972-1975  Consultant psychiatrist, Probate Court of Plymouth County, MA
1972-1974  Consultant Psychiatrist, Law Enforcement Assistance Administration (LEAA),
             Washington, D.C.
1974-1975  Medical/Psychiatric Director, Boston TASC-A (Federally funded City of
             Boston court diversion program for drug addicts)
1981-1994  Founding Director and Treasurer, The Guild for Continuing Education,
             Boston
1981-      Founding Member and Director, The Law and Psychiatry Resource
             Center, P.C., Boston
1981-1988  Reviewer, American Journal of Psychiatry
1988-      Member, Panel of Experts, Massachusetts Board of Registration in
             Medicine
1988-1989  Listing, Who's Who in the East, Marquis Publications
1990-      Listing, Who's Who in America, Marquis Publications
1994-      Listing, Who's Who in the World, Marquis Publications

3

Other Professional Activities:

| | |
|---|---|
| 1978 | Organizer and Chairman, Symposium "The Effects of the Holocaust on Survivors and Their Children," Brandeis University, Waltham, MA |
| 1980 | Panelist, "Public-Private Interface in Psychiatric Care", Scientific Meeting, Massachusetts Psychiatric Society |
| 1980 | Panelist, Issues Workshop "Should General Hospitals Accept Involuntary Patients?," Annual Meeting, American Psychiatric Association, San Francisco |
| 1981 | Chairman and Moderator, Symposium, "The Treatment of the Borderline Individual: Psychotherapeutic Approaches," The Mental Health Collaborative, Boston |
| | Featured Speaker, "Psychiatry and The Law," Scientific Meeting, Massachusetts Psychiatric Society |
| 1982-1984 | Continuing Medical Education Course Faculty, "Law and Psychiatry Update for Clinicians," Annual Meeting, American Psychiatric Association |
| 1985 | Presenter of paper, "Primum non nocere: the inpatient psychotherapy of depression, in Symposium, "Primum Non Nocere: The Psychotherapy of Inpatients," Annual Meeting, The American Psychiatric Association, Dallas |
| 1985-1986 1988-1991 1993-1994 | Continuing Medical Education Course Faculty, "Psychiatric Malpractice Prevention for Clinicians," Annual Meetings, American Psychiatric Association, Dallas, Washington, D.C., Montreal, San Francisco, New York, New Orleans, San Francisco, Philadelphia |
| 1990 | Workshop Leader, "Legal Liability for Doing Supervision," Mass. Psychiatric Society's Spring Scientific program, "Boundary Violations in Psychiatry." |
| | Speaker, Frontiers in Education, The Arbour Hospital, Boston, on "Specific Aspects of Inpatient Psychiatry." |
| 1991 | Featured Speaker, faculty forum, Psychoanalytic Institute of New England, East, on "Risk Management." |
| | Featured Speaker, Fall Psychiatric Symposium, Westwood Lodge Hospital, "The Role of Short-Term Inpatient Treatment for Long-Term Psychiatric Illness." |
| | Featured Presenter, Fall Seminar Series, Whitman Counseling Center, "The Role of Hospitalization in the Long-term Treatment of the Borderline Patient. |
| | Speaker, Emerson Hospital, Concord, MA, "Hospital Treatment of Borderline Patients Under Managed Care." |
| | Featured Speaker, Massachusetts Psychiatric Society Symposium, "Surviving in a Managed Care Environment." |
| 1994 | Featured Speaker, Westwood (MA) Lodge Hospital Spring Academic Conference Series, "Managed Care and Health Reform: What Psychiatry Should Be Supporting, But Isn't." |

4

1996        Featured Speaker, Bournewood Hospital Lecture Series, "Going Swimming with
            Jaws: Medical-Legal Pitfalls in Inpatient Psychiatry."
            Featured Speaker, The Inns of Court, "The Emotional Management of Losing a
            Case: Client and Self."

Major Extra-Curricular Committee Assignments:

1972        Board of Directors, Massachusetts Council for Public Justice
1971-1974   Board of Directors, Newton Mental Health Association
1972-1974   Advisory Board, Boston Visiting Nurse Association
1975        Chairman, Task Force on Standards for Mental Health Care Delivery in U.S.
                Prisons and Jails,  U.S. Public Health Association
1978-1983   Chairman, Psychiatry Team, Combined Jewish Philanthropies, Boston
1984-1987   Associate Chairman, Medical Division, Combined Jewish Philanthropies
1987-1991   Member, Board of Directors, Jewish Vocational Service, Boston
1986,1988,  Member, Combined Jewish Philanthropies Mission to Israel
  1991
1991-       Member, National Agencies and Community Relations
                Sub-committee of Social Planning and Allocations Committee,
                Combined Jewish Philanthropies, Boston.
1995-       Member, Social Planning and Allocations Committee, CJP, Boston

Memberships, Offices and Committee Assignments in Professional Societies:

1975-       Massachusetts Psychiatric Society
1976        Member, Committee of Directors of General Hospital Inpatient Services
1976        Nominating Committee
            Representative to the Mass. Health Planning Council
1979-1980   Chairman, Committee on Public-Private Interface in Psychiatric Care
                Delivery (with Mass. Hospital  Association and Public Health Council)
1981        Representative to Mass. Public Health Council Task Force on Guidelines
                for Delivery of Inpatient Care
1983        Nominating Committee
1988-1994   Councillor
            Chairman, Public Affairs Committee
1990        Chairman, Nominating Committee
1997        Chairman, Awards Committee
1998-1999   President-Elect
1999-2000   President
1975-       American Psychiatric Association
1987-       Fellow
1988-1994   Public Affairs Representative
1996-       Member, Budget Committee
1977-       Boston Psychoanalytic Society

5

| | |
|---|---|
| 1983-1984 | Director of Publicity, 50th Anniversary Planning Committee |
| 1985-1992 | Member, Symposium Committee |
| 1989-1995 | Member, Public Information Committee |
| 1977- | American Psychoanalytic Association |
| 1977- | International Psychoanalytic Association |
| 1984- | American Academy of Psychiatry and Law |

Teaching Experience:

1976-1994  Teaching general psychiatry to residents, fellows and medical students, Faulkner Hospital, Boston

1978  Case Conference, Cambridge Court Clinic

1979  Adult Psychiatry Conference, Tufts New England Medical Center

1981-1985  Instructor, Course in Psychopathology, Simmons Graduate School of Social Work

1982  Grand Rounds, Tufts Dept. of Psychiatry and Grand Rounds, Mass. Mental Health Center, "Anatomy as Destiny: Female Sexual Anatomy and Self-Esteem."

Clinical Conference, West-Ros-Park Mental Health Center

1981  Grand Rounds, Tufts Dept. of Psychiatry and

1983  Grand Rounds, Mass. Mental Health Center, "Superego, Ego Ideal, Affects, and a Typology of Depressive Illness."

1986  Clinical Conference, Mt. Auburn Hospital Dept. of Psychiatry and Grand Rounds, Beth Israel Hospital Dept. of Psychiatry, "Going Swimming with Jaws: Malpractice Risks Inherent in Inpatient Psychiatry, A Case Presentation."

Presentation, Members' Seminar, Boston Psychoanalytic Society, "Inheriting the Resolution of the Oedipus Complex: Superego, Ego Ideal, and Affects."

Nursing Staff Inservice Seminar, Faulkner Hospital, "Manic Depressive Illness."

1987  Clinical conferences, Mt. Auburn Hospital, Carney Hospital, Tufts New England Medical Center

1988  Inpatient Grand Rounds, Massachusetts General Hospital, Lindemann Center, Boston, "Malpractice Risks Inherent in Inpatient Psychiatry."

Clinical Conference, Carney Hospital, Boston

Clinical Conference, Westwood Lodge Hospital

Grand Rounds, Human Resource Institute, Brookline, MA, "Long-term Treatment of the Borderline Patient on a Short-term Unit."

1989  Grand Rounds, Beth Israel Hospital, Boston, "Elements of Malpractice risk Prevention."

Inpatient Grand Rounds, Lindemann Center, Massachusetts General Hospital, Boston, "Swimming with Jaws: Further Adventures in the

6

             Shark-pool of Malpractice."

             Psychiatry Grand Rounds, Mt. Auburn Hospital, "Testifying in Court and at
                Depositions."

             Psychiatry Grand Rounds, Leonard Morse Hospital, Natick, MA,
                "Long-term Treatment of the Borderline Patient on a Short-term Unit."

             Psychiatry Grand Rounds, Danvers State Hospital, Danvers, MA,
                "Malpractice Risks on Inpatient Services."

             Featured Presenter, Guild for Continuing Education Symposium, Boston,
                "Long-term Treatment of the Borderline on a Short-term Unit."

             Case Conference, Carney Hospital, Boston

             Workshop Instructor, Boston Institute for Psychotherapies, "Malpractice
                Prevention."

1990      Morbidity Conference, Waltham-Weston (MA) Hospital

             Mortality Conference and Clinical-forensic Consultation, McLean Hospital,
                Belmont, MA

             Clinical Conference, Psychiatric Emergency Department,
                Tufts New England Medical Center.

1991      Featured Presenter, Academic Conference, Westwood Lodge Hospital,
                Westwood, MA, "Inpatient Contribution to the Long-term Management of
                the Borderline Patient"

             Attending Rounds, "Forensic Issues," Lindemann Center, Boston.
                Presenter, Psychiatric Academic Clinical Conférence, Framingham (MA)
                Union Hospital, "The Role of Hospitalization in the Long-term Treatment
                of the Borderline Patient."

1992      Psychiatric Grand Rounds, Mt. Auburn Hospital, Cambridge, MA,
                "Long Term Treatment of the Borderline On a Short-term Unit."

1995,1996  Faculty, Winter Trial Advocacy Workshop, Harvard Law School.

1997      Teaching clinical/forensic conference, Carney Hospital, Boston, MA

## Publications:

"Double-outlet right ventricle with pulmonary valve atresia." Case report, <u>American Heart
    Journal</u>, 72/2:259-264, 1966.

Peace corps, Nepal, Medical Survival and Preventive Medical Training Manual, 1967.

Report of conference, "Fathers and sons: the oedipus complex in the 19th century,"
    Professor Bruce Mazlish, Journal of the Philadelphia Association for Psychoanalysis,
    1/2:182-183, July, 1974.

"Guidelines for mental health services in prisons and jails," American Public Health
    Association, 1976.

"The neglected alliance: the inpatient unit as consultant to referring therapists," <u>Hospital
and Community psychiatry</u>, 33/5:377-381,1982.

7

"Mental health care planning for the 80's: psychiatry's crucial role," General Hospital Psychiatry, 3:24-249, 1981.

"Individual Psychotherapy, " in Inpatient Psychiatry: Diagnosis and Treatment, Sederer, L.I., editor, Williams & Wilkins, Baltimore, 1982, revised (second edition), 1986.

Book review, "Dangerous Diagnostics: The Social Power of Biological Information," in General Hospital Psychiatry, 13/6:411-412, 1991.

# EXHIBIT 2

To whom it may concern,

My name is Joseph A. Dufour and I am a well respected business owner in Gardner Mass. I own my own taxi stand in Gardner that has been well established in the same location for the past four years.

The reason for this letter before you today is that I wish to tell you a little bit about the defendant before you. His name is Nicholas Rheault and he is one of my close and personal friends ,and has been for about 12 years now.

I first met Nick at about the age of twelve at the St. Bernards summer sports camp. We had both attended camp together for a few years and became very close. We had a lot in common including coming from a good middle class working family and many of the same likes as well. Although there was a bit of an age difference we seemed to grow close rather quickly.

After I had stopped attending the sports camp we lost contact for a few years, until we became reacquainted at elementary school. We immediately started to hang around together again. We would attend after school functions and plan on getting together on the weekends. When we weren't in school we would be together with our other friends that we had in common playing sports. We would either play football or basketball usually.

We both attended the same high school and still had a lot of the same friends in common. Even to this very day we stay in contact writing to one another, and we've always been there for each other as well. Nick is one of my closest friends and it breaks my heart to know that he might be gone for a while. He has helped me out financially when I wasn't able to help myself. Nick has always been the one to keep me out of trouble growing up, and telling me to think through my actions before regretting them.

When I was almost beat up over a misunderstanding at a high school football game, Nick went out of his way to talk them out of it. When there were about 5 or 6 people that wanted to harm me Nick was there willing to stand by me no matter what the outcome was going to be. I'm not saying that fighting is right but to have a friend willing to put himself on the line speaks louder than words.

Upon Nicks release I give my word to the courts that he is always guarenteed a job at one of my establishments, and I will more than gladly put a roof over his head if need be. So in closing I would just like to tell you that he is one of the most noble and stand up guys I have ever had the pleasure of knowing.

Sincerely
Joseph A. Dufour

Linda M. Allard
53 Dupont Circle
Leominster, Ma. 01453

April 28, 2006

To Whom It May Concern:

I am writing this letter to you on behalf of Nicholas Rheault and his family. I have been
friends with the Rheault family since 1980. Deb and Roland Rheault have always
provided a very loving and nurturing home. As parents both have been very involved in
their children's lives, involved in sport activities and always willing to provide any
support which was needed for the different teams on which their children participated. I
have always felt able to depend on any member of the family, including Nicholas, who
has always been a very giving person, to answer any need I or my family may have or
had. Our daughters were involved together in many activities, and my children who are
now thirty-one and thirty three years old still reminisce about the wonderful times shared
together with the Rheault family.

Nicholas, I am certain can be a contributing member of society. He was raised and
instilled with strong moral and ethical values. I have seen Nicholas exhibiting these
attributes most of the time. I do not know what drove Nick down the wrong path, but I
know it will not, should not be the path of no return. If anyone is worthy of
rehabilitation, I feel it is Nicholas. He with the help of others, primarily his loving family
can once again be sent down the path of contributing in a positive manner to society. He
is a good young man; I feel it would be a great loss to society as well as his parents if not
given the opportunity to redeem himself. Both his sisters, Ashleigh and Alexis, are close
to their brother and will also be there to guide him along with any professional help he
may need.

All of Nick's family are contributing members of our community as well as society as a
whole. I truly feel Nicholas also can be a contributing member of our community. He
has all the morals, and ethics instilled in him, as well as a successful family behind him.
Please consider giving him a chance with the support of his family, to contribute to our
community and society once again.

Sincerely,

*Linda M. Allard*

Linda M. Allard

Marsha A. Wintringham
William A. Wintringham
20 Marilyn Street
Holliston, Massachusetts 01746

To Whom It May Concern:

This letter is written in support of Nicholas Rheault. We have known Nicholas's parents since 1968 as college students. We have shared experiences of college, marriage and child rearing. We know both parents to be loving and supporting parents to Nicholas and his sisters. Nicholas has made a series of decisions hurtful to himself and society that have caused his own perilous situation. He has brought dreadful hurt to himself and his family that has been extremely painful for us all to watch. We pray that Nick is finally aware of the fact that as a result of his decisions and actions, he has put unnecessary hurt on his own family and, a number of times, has put them in grave danger. However, we also remember Nicholas to have been a decent young man who had many friends, loved snowboarding and going to Red Sox games.

We wish for you to consider Nick's age and his potential as a young, intelligent, good-hearted young man, capable yet of doing good and contributing to society in a positive way. Please consider that he comes from an intact family that loves him very much, wants to support him, and see him have another chance to prove the good that they know he really has inside. Please do not consider a maximum sentence for Nick, but to consider instead, a chance to prove himself as a loving son and brother, and to become a productive member of this society. His family and friends are committed to be there for him if given this opportunity. We fervently believe that a maximum sentence may well punish Nick, but will not enhance his chances at turning his life around and once again live a decent, honest life.

Respectfully,

Marsha A. Wintringham
William A. Wintringham

May 18, 2006

To Whom It May Concern:

I'm writing this letter on behalf of my friend Nick Rheault. I have never had to write a letter of this nature and I pray that the words I write do not hurt Nick in any way regarding his case. I am writing to help him.

I will begin by telling you a little bit about myself. I am a single mother of two boys. I work full time as an Assessor for a municipality. I recently attained my Masters degree in Business Management. I own my own home which my two boys, my mother and I reside in.

The first time I met Nick was when he and my son joined little league. They were about 7 or 8 years old and played on the same team. So I have known Nick for a long time. Nick would visit my son and they would hang out and Nick was always very respectful. I never had any trouble with him and he did whatever I asked him. If I said do not eat in the bedrooms he never did. Always took his shoes off when he came in my home and was just a real nice kid. As Nick got older that never changed. For the last four years that my mother has been living with me, Nick would always make a point to talk to her and me when he came over. He always took the time to say hello and how are things going and we would have talks about many things.

When my son told me what had happened to Nick I was heartbroken for him. As a single mother of two boys, one Nick's age and one younger, I can honestly say that they get confused at times and they make terrible choices for themselves. This is part of growing up and becoming adults and some have a much more difficult time than others. In all the years that I have known Nick he was always a good kid. He had jobs off and on like all boys his age and was trying to find his way. Nick has made some terrible choices for himself and now he is in big trouble. He was so young when all this happened. He hasn't had a chance to grow up yet. He was really just a kid making some real serious decisions with life altering consequences. He got tangled up in something that was much bigger than he could have ever imagined. I ask that you consider giving Nick a chance at life and not send him away for very long. I have been writing to Nick since he was sent to prison and I believe that he realizes that he did wrong and that he can never

go back to that kind of life. He has expressed great regret for what he has done and is truly sorry for his behavior. I know that he would work very hard at living a law abiding life when he got out. He was just a kid when this all happened and he hasn't had a chance to become an adult. I would hate to think that his learning to become an adult would be done in prison. So I ask that you go lightly on Nick and let him have a chance at life.

As a single mother of two boys that I have raised on my own I can tell you that life can be difficult at times. When you do not have the resources or the time because you have to work full time and at times find it difficult just to put food on the table, mistakes can be made. In Nick's case he was out there. He left home and got into something that he should have never let happen. Please do not destroy is whole life. He still has a chance to find a job and make a life for himself. Maybe find a girl and get married and have a family of his own. If he has to stay in prison for a long time I do not think that he would have a chance at life. I pray that you go easy on him and let him have a chance to start over. Thank you for your time and consideration.

Sincerely,

Angela M Marrama

# EXHIBIT 3

March 28, 2006

John Swomley
227 Lewis Wharf
Boston, MA. 02114

To Whom It May Concern:

I am writing this letter in reference to my son Nicholas Francis Rheault sentencing on
May 24, 2006.

Nicholas is the youngest of 3 children, two sisters, Ashleigh 34 and Alexis 25. He was
raised in a home filled with love and discipline and I have to say he was disciplined a bit
more than his sisters. He was always a headstrong child but I don't think any more or less
than other little boys his age. His rebellious side became apparent around the age of 12
and as parents we thought we were dealing with the issues in an appropriate manner.
Needless to say as time passed it became obvious that we needed help. We sought out
counseling to help us out.

Now, as an adult, I agree that he should be held accountable for his actions, however, I
would ask you to look at a young man that can be a productive part of society. A family
that loves and supports him and will offer whatever assistance he required to get started
surrounds him.  I honestly feel that having him serve the maximum sentencing would not
be in his best interest. He's a young man that because of his drug use has not really
socially and mentally developed to his 22 years. I believe that with a few years of time
spent in the confines on a prison setting and the services it can provide will give him a
good foundation for starting his life over. He will have matured and have had time to take
in all that he lost and all that he has to look forward to.

I'm asking that the court be fair in it's judgement of this situation and take into
consideration his age and what he will offer to society when released. His family will be
there to give him help and support and I feel this incident has scared him enough to
realize what he had done.

Thank you,

Deborah Rheault

Deborah Rheault

John Swomley
227 Lewis Wharf
Boston Ma, 01210

To Whom It May Concern:

I am writing this letter in reference to sentencing for Nicholas Rheault.

Without question Nick has made some pretty poor choices leading up to this point in his life. He deserves to penalized for the crimes he has committed. I just hope that the sentence he receives doesn't take away from a good life that I know he could lead.

What I truly believe he needs is some counseling and mental help. He has always been a troubled kid. I think for the most part everyone believed it was a phase, but he just sunk further and further into it. This, I'm sure, has served as a wake up call.

With the professional help and the support of his family I firmly believe that he has the ability to grow up and become someone of use to society. I would like to seem he get a second chance at doing this while he is still young enough to have a full future in front of him.

He is a good kid who made some bad choices. I know he can turn his life around if he is given a chance.

Thank you,

Alexis Rheault

March 30, 2006

Mr. John Swomley
227 Lewis Wharf
Boston, MA 02110

To Whom It May Concern:

I am writing this letter in regards to Nicholas Rheault's sentencing on May 24th. I am the oldest of 3 kids and our lives were pretty normal. Nicholas was a bit more difficult than me and my younger sister and was disciplined quite a bit. I am 13 years older than Nicholas so by the time he was 12 I was 25 and old enough to see the path he was on.

My parents had taken him to therapy and he was diagnosed with Oppositional Defiance at a young age. As a family we all gave him the support he needed and tried to work with him. I know he's my brother and I love him but what most people don't know about him is that he really is a good person. He has a good heart and really tries to do what's right. I believe that his judgment has been impaired due to the amount of drugs he used over the course of time. When my brother is straight he is a totally different person.

I do believe that he should be punished for his actions but I also believe that he is young enough to be able to make a good life for himself. Given enough time from his prior habits I believe he will see what a waste his life has been. He is young enough to start a new life with new habits and people that provide him with the support he needs.

I love my brother and will be willing to give him emotional support and help when he is released. His time in jail will help him to realize that his family was always there for him during the rough times and will be there going forward.

Thank you for your time and your consideration in the matter at hand.

Sincerely,

Ashleigh Rheault